It pleases the Court, my name is Amy Rose and with me today is my colleague Dan Baumat and together we are pro bono counsel for appellant Antonio Cortez Buckley. Your Honors, I will be addressing Mr. Buckley's First Amendment claims which arise from the seizure of his Jewish prayer shawl or tallit and Mr. Baumat will address the Eighth Amendment claims arising from his placement in the holding cell. Your Honors, this Court should reverse the District Court's grant of summary judgment because Mr. Buckley demonstrated genuine issues of material fact as to whether or not the seizure of his tallit substantially burdened his practice of his faith of Judaism. The District Court impermissibly held that Mr. Buckley's religion was not burdened because Judaism only mandates a prayer shawl for daily prayers and Mr. Buckley had access to other prayer shawls. Roberts. He had at least two others, right? Presley. Yes, Your Honor. Roberts. Is that wrong? Presley. Yes, Your Honor. The United States of America … Roberts. … has never declared anywhere that you must have multiple prayer shawls in order to be able effectively to practice your religion. Presley. Your Honor, Mr. Buckley declared that his exercise of his faith of Judaism involved the use of rituals involving four prayer shawls. Roberts. So it's idiosyncratic. In other words, if he would have said, I need a hundred, the prison must allow him to have a hundred. Presley. Your Honor, there are two parts to your question … two parts to the answer to your question. The first part is that, no, if a trier of fact determined that Mr. Buckley's stated need for a hundred prayer shawls was not a sincerely held religious belief, then yes. Roberts. Well, what if it's sincere? I need one hundred of these. I'm a different kind of a practitioner and I need a hundred. I'm not trying to play games, but he has multiple shawls and so there has to be somewhere, some tent peg that says that he needs more than one, doesn't there? Presley. No, Your Honor. Roberts. If the Jewish religion says one is enough, then are we allowing just idiosyncratic behavior to determine what the Constitution requires? Presley. No, Your Honor. As a preliminary matter, Judaism has various different sects. There are orthodox and more modern versions of Judaism and the Court didn't say where it was getting its tenet from. However, more importantly, the United States Supreme Court has affirmed many times that it is not within the judicial ken to question the centrality of a particular belief or practice to a faith. It is not up to the district court or this court or the Supreme Court to say what an individual's religion requires. Roberts. So you are – what you're telling us, what I hear, is an individual gets to state his or her religious beliefs and that's the end of it. And if they're outlandish, that's too bad. They're protected by the Constitution. Presley. No, Your Honor. That's where the second prong comes in, in this case, in the prisoner context, whether or not the violation or the burden was reasonably related to a legitimate penological interest. But as to whether or not there is a burden, yes. It is up to the individual practice – practitioner to demonstrate to the court what their faith requires and how it was burdened by the seizure. The court is not equipped to weigh and determine what practices or beliefs are legitimate or central or required and which are not, simply not the role of the district court. And Mr. Buckley did declare and state and argue in his papers that his practice of Judaism requires the use of four prayer shawls. What's there to show that there was no legitimate penological interest in taking something out that appeared to the guards to be gang colors? I mean, everybody knows what gang colors signify, and prisons go to a great extent to try to keep these things under control. Is that a legitimate penological interest? We don't allow people to display gang colors? It is a legitimate penological interest, Your Honor. However, there are still material issues of fact on that prong as well because the district court presumed for purposes of summary judgment that the item was a tallit, and it never reached the legitimate penological interest prong because it found no substantial burden. The item hasn't been determined definitively to have been either a blue towel, as the defendants claim, or a tallit, as Mr. Buckley claims. And … Is it gone? Yes, Your Honor. The … So we can never make that determination other than attach credibility to your client's statement that it was a tallit. Yes, Your Honor. And that would be a determination for the trier of fact. Unfortunately, the defendants failed to follow prison protocol and destroyed the tallit after they seized it, instead of returning it to the property room so that Mr. Buckley could send it home. Were all these … were these tallit all in the same place? Your Honor, no. The record is not clear as to where the tallit … the various tallit were stored. Because why did they leave some and take another one if they were involved in a religious exercise? Your Honor, that is precisely one of the reasons why it's unclear how this could be reasonably related, because they seized one towel, but not tallit, but not the other three. That they … their own testimony by Rabbi Brook … Book, excuse me, stated that all Jewish tallits are white with blue striping, yet they only seized one and not the other three, which they presented evidence that Mr. Buckley possessed. Your Honors, I'm sorry, but we are short on time, so I'd like to turn it over to Mr. Belknap. Thank you.  In the proceedings below, Mr. Buckley alleged numerous violations of the Eighth Amendment, but I would like to address two in particular that were not specifically addressed in the district court's ruling, namely Mr. Buckley's allegations that he was denied water for 11 hours while held in the holding cage, and the allegation that he was in the cage wearing nothing but an athletic supporter. I think it's undisputed that water is a necessity of life, and as such, denial of water can give rise to an independent … You may have an objective claim across the board, but where is there any evidence at all of the required culpable state of mind the Supreme Court tells us has to exist for this to be one of these kinds of violations? Well, the culpable state of mind question hinges on the admitted disputed facts in this case. Mr. Buckley offered testimony that he informed, or repeatedly informed, the defendants that he had not received any water during the course of his confinement to the holding cage. The testimony from the other side was that Defendant Granis had been told by staffers that he had been fed, but not necessarily that he had received water at one point. Of course, the question then becomes whose testimony do you believe? Mr. Buckley said, I told Defendant Granis and Defendant Trujillo that I hadn't received any water again. Your position is that's sufficient to draw an inference that it was done with a culpable state of mind. Exactly. He — they were made specifically aware that he had not. There's also testimony that when Mr. Buckley informed the defendants that he hadn't received anything, Defendant Trujillo said specifically, you have nothing coming, quote, you have nothing coming, end quote. What is the evidence of actual damage or injury as a result of the deprivation? No, there is no evidence of actual permanent damage or injury, but I — we submit that the standard that the defendants would hold Mr. Buckley to can't be — can't be met, essentially. If the prisoner is denied medical attention or denied attention and never receives his attention and recovers from the denial of attention, then by definition, that apparently is not an Eighth Amendment violation. Well, even if it is an Eighth Amendment violation, what's the evidence of damage or injury? There doesn't seem to be any. So what's your recovery, a dollar? Well, Mr. Buckley is seeking injunctive relief and, yes, damage is. Injunctive relief of what kind? I would — he wants his pallet returned, first of all. Well, you're talking about the other allegations that you're talking about. Specifically, I believe he's asking that the holding cage — the conditions of the holding cage be changed. I don't recall exactly what he's pleading for below. You also had a claim for retaliation. I'm sorry? You also had a claim for retaliation. Correct, which we weren't going to address. But, yes, the retaliation claim still that the timing and the nature of both the taking of his pallet and his placement in the holding cage and the circumstances of his placement, the conditions of the holding cage, can give rise to a reasonable inference that these actions were taken against him out of retaliation. But that doesn't insist, though, that the officers knew about this. Admittedly, below, there was none other than, again, the fact of the timing and the circumstances, there was no direct testimony that they actually knew. I would submit that that's largely — it can be attributed to the fact that Mr. Buckley, of course, a plaintiff and didn't know how to develop the evidence. But, admittedly, there is no direct evidence. I would like to reserve the remainder of our time for rebuttal. Thank you. Good morning. Deputy Attorney James Flynn for Dependents of Kelly. I'd like to just address a couple of points. The officers did not take all of Mr. Buckley's prayer shawls. In fact, he had three other ones. They were in a cell. They show up on his property receipt for the property that was inventory when he left. So they didn't take them. They were in his cell. And I think that indicates that they weren't on some kind of religious vendetta. The one they took was a blue one, as the Court correctly identified. The officers believe it could be used as gang colors, which is a legitimate theological interest. Plaintiffs, I think, in this case, are asking for this Court to establish a rule that the district courts are supposed to go beyond the relaxed rules regarding pro se litigants and, in fact, extend the rules governing 12B6, motions to dismiss, into the Rule 56 summary judgment arena and effectively infer facts that are not in the record in terms of what Mr. Buckley's religious practice is. But he never said anything about why he needed a number of prayer shawls or this particular one. He simply said, I'm entitled to have whatever I want in the way of prayer shawls or religious artifacts to practice my religion. And that clearly is not the law under the test. I don't think the Court has to go as far as plaintiffs are asking in this case. The district court properly found that there was no substantial burden on his exercise of religion, and that standard applies whether it's under the First Amendment or RLUIPA, the Religious Land Use and Institutionalized Persons Act. And in that regard, Mr. Buckley … Does RLUIPA cover this case? No, it doesn't, Your Honor. Mr. Buckley didn't plead that cause of action. The facts here happened before RLUIPA. Exactly. He didn't plead it. He only mentioned the Religious Freedom Restoration Act, which had been declared unconstitutional as applied to this case. So neither the Court nor defendants were on fair notice that that was a claim. And as Your Honor states, it proceeded. And this is – although they mentioned an injunctive relief remedy, that isn't really in this case. It's a one-time event. He's really seeking damages, so RLUIPA couldn't possibly apply, even prospectively. What's your answer to the other allegations that he was treated harshly in violation of the cruel and unusual punishment clause? Well, one fact that I think both sides overlooked that I noticed in going over Mr. Buckley's exhibits is that Exhibit 17, which is the defendant's excerpts, pages 525 to 527, he includes two progress notes from his medical record. And those progress notes state that – and one of them's dated August 21, 1999, which is two days after the placement in Ad Sec – he states to the medical staff on that occasion that he had been on a hunger strike for the preceding two days to protest his placement. And other – the remaining records indicate that that went on for at least four days. He was not eating and drinking. He was drinking a little bit, but not much. He was asking for resource to supplement. So it – the damage question you ask is interesting in light of that fact. Which exhibit was that, 17? It's his Exhibit 17, the defendant's excerpts, 525 to 527. There is a conflict. I mean, Lieutenant Granis says she was told, and when they investigated his grievance, they were told by the officers, none of whom were defendants, that they did feed the inmates in the holding cell. That's what she knew. So she had no particular reason. The key fact, I think, that the District Court focused on is that they were in a state of emergency during – at this time, and they – nobody anticipated he was going to be in that cell that long. There was a delay finding him an open cell and one with a compatible cellmate. It stretched on for 11 hours. I think if you look at the record, he went in at 9, presumably – Does everybody agree this was a holding cell? Yes, about a four-by-four-foot holding cell. In what state of dress or undress was he in that cell? He – Lieutenant Granis says he had his gloves on when she saw him. He says he was only wearing an athletic supporter, but that it's a wire mesh cell, so it's not an open barred type cell, so there's some obscuring of the person inside. And that everyone agrees that when he was transported to Ad Seg, he was given an orange jumpsuit to wear. So, if we assume his facts are true for purposes of summary judgment, he was wearing an athletic supporter. For 11 hours. Pardon me? For 11 hours. Approximately 11 hours. That's his version of events. And his version of events would be that he received no water for 11 hours? That's what he would say, yes. After his morning meal, which he presumably would have had because he went in the cell approximately 9 a.m., he says he got back to Ad Seg at around 8. He says he would have missed lunch and dinner and not had access to water. That's what he says. My clients dispute that, but for purposes of summary judgment, we accept that it's true. How about medical treatment? Pardon me? How about medical treatment? Well, his argument is typically when inmates go to Ad Seg, they get what's called a medical clearance. In other words, to make sure there's no medical problem that would preclude their placement in Ad Seg. That's what I think he's saying he didn't get. There isn't any evidence that he had any sort of serious condition that he needed treatment for. And, in fact, his medical record is devoid of any evidence of that. The only thing he complains about is that he had some pain in his legs from standing, even though he could have squatted or sat down in the cell, and that that pain was gone by the following morning. That's what we have. So overall, these are rather modest deprivations, not the kind that typically you would find in an Eighth Amendment case. And very short term, Your Honor. Ninety degree weather, no water for 11 hours? Ninety degree in the shade. All the cases that have dealt with situations with no water is where, for example, inmates have been out on exposed and far hotter temperatures. He was in a shaded breezeway, so the temperature was probably less than 91 where he was. What, in terms of, you know, looking at whether there's an issue of fact, he says he told the correctional officers on several occasions that he wasn't getting water, and they sneered at him or offered him no relief. Is that some showing of the required state of mind? I think not, Your Honor, in this case. I think not. In the case of Officer Trujillo, it only happened two hours after he'd been in there and right before lunch. He says Officer Trujillo said he had nothing coming. Arguably, they were anticipating he was going to get to his cell and add SIG as soon as possible, and that just kept dragging on. Officer Granis saw him around 2.30 when she came out of classification committee hearing. Can we ask somebody again, the officer just smiled at him? That's what he says, Your Honor. Officer Granis says that he had been medically cleared for add SIG. What does that mean? That he didn't have any serious medical condition would preclude his Does that mean somebody checked him out or just that he had nothing in his record? Typically, it would be a doctor who would do that. Is that a result of an examination or a review of his medical file? Probably a review of his record, Your Honor. Our point, the defendant's point, is that even if you take all of his facts as true, the deprivations here just don't really rise to the level of an objective or the subjective grounds. He doesn't show any harm from not having water or food for this brief period of time. He would have had it before and he would have had it after, and as that indicated, apparently he went on a hunger strike. It's possible he started his hunger strike in the holding cell. We don't know that right now. But we do know he started one that day. Anything else? Thank you. Any rebuttals? Just a quick few points, Your Honors. Mr. Buckley did declare and did provide argument that his practice of Judaism required the use of four prayer shawls. He stated that the illegal confiscation of his prayer shawl prevented him from engaging in his religious services, which included using four prayer shawls. Was this under oath or just an argument to the court? Your Honor, he made statements both under oath in his declaration and in his argument portion. I believe the declaration was not as detailed as it could have been, but again, that is due to the fact that he's a pro se litigant and did not understand that he should put forth all the facts demonstrating precisely why he needed four prayer shawls. And it's his position that he doesn't need to explain every reason why he needed four prayer shawls. He sincerely believes that it's required for his practice of his religion and that is protected under the First Amendment. As to the Eighth Amendment claims, Your Honor, the hunger strike, and Mr. Buckley in the record, it states that the hunger strike was not begun until after his confinement. And yes, there is no evidence that he was, that there was any actual injury or damage to him as a result of his confinement, but that is because the defendants failed to follow protocol and have him medically cleared before he was transferred into Ad Seg. Of course, two or three days later, after he's no longer in a state of dehydration and standing for 11 hours in 90 degree weather, he probably was medically okay when he was finally checked out. But that does not mean that there was not a serious risk of injury to his health by being confined in a cage, almost naked, for 11 hours in 90 degree weather without food or water. Thank you, Your Honors. Thank you. The matter will be submitted.
judges: Trott, T.G. Nelson, Paez